1  of me, the clerk on my right shall give you an oath.
2              **GORDON KERR DORR, PLAINTIFF'S WITNESS, SWORN**
3         THE CLERK:  Thank you.  You may have a seat in the
4  witness box.  For the record, please state your full name,
5  business address, and spell your last name.
6         THE WITNESS:  My name is Gordon Kerr Dorr.  Dorr is
7  spelled D-o-r-r.  I'm employed by the Anchorage Police
8  Department.  I can be contacted there at 4501 South Bragaw,
9  here in Anchorage.
10        THE CLERK:  Thank you.
11        THE COURT:  Mr. Goeke.
12        MR. GOEKE:  Thank you, Your Honor.
13                       **DIRECT EXAMINATION**
14 BY MR. GOEKE:
15 Q    Detective Dorr, who are you currently employed by?
16 A    The Anchorage Police Department.
17 Q    And what is your position with the Anchorage Police
18 Department today?
19 A    I am a detective and I work in the drug unit.
20 Q    And how long have you been a detective with the Anchorage
21 Police Department?
22 A    Just over three years.
23 Q    Do you have any other prior law enforcement experience
24 before becoming a detective?
25 A    I do.  Approximately five years as a patrol officer here

1  is?
2  A   A confidential informant is a person, oftentimes a
3  criminal, who has decided to cooperate with law enforcement.
4  Generally they are a person who has knowledge about individuals
5  that are involved in particular crimes that that agency or that
6  particular detective is trying to investigate.
7  Q   About how many times have you participated in an
8  investigation involving a confidential informant, do you think?
9  A   The vast majority of the cases that I've worked in the
10 last three years are cases of that type.
11 Q   So those -- did those cases involve drug investigations?
12 A   They do.
13 Q   Were you working an investigation during late February and
14 March of 2005 that involved the defendant?
15 A   Yes, I was, sir.
16 Q   What did that investigation consist of?  What was your
17 role?
18 A   I was asked by Detective Doll to handle the undercover
19 portion of that investigation.
20 Q   So when you participate in an investigation under -- in an
21 undercover capacity, do you identify yourself as an Anchorage
22 detective?
23 A   No, sir.
24 Q   What --
25 A   You do not.

1  Q    What do you do?
2  A    You -- during the windows of operation where you're having
3  contact with the subjects of the investigation, you assume the
4  role of somebody that is involved in that type of activity.  In
5  a case such as this, my role would be to be -- pose as a buyer
6  of drugs.
7  Q    And did you do that in this case?
8  A    I did.
9  Q    And what role did you adopt for that purpose?
10 A    I adopted the role of an individual that lived out in the
11 valley, remote from Anchorage, who has money that was -- that I
12 was willing to invest in a quantity of methamphetamine for me
13 to turn around and sell at -- at profit.
14 Q    Did there come a point in the investigation where you were
15 introduced to the defendant?
16 A    There did.
17 Q    And when did that occur?
18 A    That happened on February 25th of 2005.
19 Q    And who introduced you to the defendant?
20 A    The cooperator in this case.
21 Q    And who was the cooperator?
22 A    That cooperator's name is Shannon Lovell.
23 Q    And do you know -- did you know anything about his
24 background during the course of the investigation?
25 A    I do.

1  Q    And what do you know about him?
2  A    He had several convictions, felonies.
3  Q    And what -- why was he used in this particular case to
4  make an introduction to the defendant?
5  A    The same reason that a cooperator in many cases is used,
6  is Mr. Lovell had the preexisting relationship with Mr.
7  Snegirev. It's not common to be able to approach a person cold
8  and offer to buy drugs without having some connection to the
9  subject that you are investigating.
10 Q    So could you describe that first introduction? When did
11 that occur again?
12 A    That happened on the 25th of February.
13 Q    And how did that occur? If you'd just describe it for the
14 jury.
15 A    Mr. Lovell was sent over to Mr. Snegirev's residence at
16 1200 Surrey Circle to drive Mr. Snegirev to a -- a location
17 where we were to meet. Mr. Lovell and Mr. Snegirev arrived at
18 that location, as did I. I drove my own vehicle and those two
19 were in Mr. Lovell's car.
20 Q    Did you make contact with Mr. Lovell and the defendant?
21 A    I did.
22 Q    And where did that contact occur?
23 A    That contact occurred off the Old Seward Highway in the
24 parking lot of the Sports Authority.
25 Q    And Surrey Circle, where is that? Is that in Anchorage?

```
 1  A    It is.  Surrey Circle is south of that location, off of
 2  the Seward Highway to the east --
 3  Q    Is this the --
 4  A    -- north of O'Malley.
 5  Q    Is this the first time you'd ever met the defendant?
 6  A    Yes, sir.
 7  Q    And what transpired during that meeting?
 8  A    Mr. Snegirev and I -- first of all, we were introduced by
 9  Mr. Lovell, and then Mr. Snegirev and I negotiated over the
10  purchase price of a pound of methamphetamine.
11  Q    About how long did this meeting take place?
12  A    Maybe six minutes, maybe eight minutes.
13  Q    Were you able to reach a conclusion as to price and
14  quantity?
15  A    We were not.
16  Q    Did you make a tape recording or was that meeting tape
17  recorded?
18  A    It was.
19  Q    Have you had an opportunity to listen to that tape
20  recording?
21  A    Yes, sir.
22       MR. GOEKE:  Your Honor, may I approach the witness?
23       THE COURT:  You may.
24  BY MR. GOEKE:
25  Q    I've handed you several exhibits, Detective Dorr.  One of
```

1  Q   Was that electronic recording the same as the recording on
2  the audiotape?
3  A   Yes, sir.
4  Q   And where did you listen to that electronic recording?
5  A   Also at your office.
6        MR. GOEKE: Your Honor, I'd like to play for the jury
7  what has been marked Government's Exhibit 1 in electronic
8  format.
9        THE COURT: Are you -- you're seeking to introduce
10 Exhibit Number 1?
11       MR. GOEKE: I will at the conclusion of the -- of it.
12       THE COURT: Well, I don't want to play it unless it's
13 going to be introduced in evidence.
14       MR. GOEKE: Then at this time I'll seek to admit
15 Exhibit 1.
16       THE COURT: Mr. McCoy?
17       MR. MCCOY: Can I voir dire the witness, please?
18       THE COURT: You may.
19       MR. MCCOY: Thank you.
20                         VOIR DIRE
21 BY MR. MCCOY:
22 Q   Detective Dorr, before you made this tape recorder, did
23 you -- tape recording, did you obtain a warrant from a judge?
24 A   No, sir, I did not.
25 Q   All right.

```
 1  Q    What type of car was it that you met in?
 2  A    It was a small red sedan.  I don't remember the model.
 3  Q    And who is the second voice you hear on the tape?
 4  A    Myself, announcing my name.
 5  Q    Okay.
 6  02:04:16
 7       (Recording played)
 8  02:05:05
 9  Q    Who is the voice speaking the longest after we first
10  started playing the tape?  Is that your voice?
11  A    That was my voice.
12  Q    And what did you say on that tape?
13  A    I asked Mr. Snegirev what a pound would cost.  I told him
14  that I wanted it clean, uncut --
15  Q    And --
16  A    -- meaning no cutting agent added to it.
17  Q    And there was another voice that came on the tape after
18  yours.  Whose voice was that?
19  A    That was Mr. Snegirev.
20  Q    And how did he identify himself when you met him?
21  A    He said his name was Peter.  We shook hands.  We looked at
22  each other face to face.  The cooperator was sitting in the
23  driver's seat, Mr. Snegirev was in the front passenger seat.  I
24  sat behind Mr. Snegirev.
25  Q    And this tape is a -- you hear some rustling and things of
```

1  that nature.  Who -- how was this tape made?
2  A    This tape was made by a transmitter that -- a wire
3  transmitter that the cooperator, Mr. Lovell, was wearing on his
4  person.
5  Q    So the rustling around, is that --
6  A    It was some food wrappers.  I think Mr. Lovell had had
7  some type of a meal.  I think later on you'll hear him slurping
8  on a straw.  In fact, eventually he becomes sick to the stomach
9  and I actually have to ask him to step out of the car while he
10 vomits.
11 02:06:18
12     (Recording played)
13 02:07:09
14 Q    What do you mean when you say, "A pound here from you to
15 me"?
16 A    A pound delivered here in Anchorage from Mr. Snegirev to
17 me, no intermediaries, no other people that might put cutting
18 agent on it.  The arrangement was between Mr. Snegirev and
19 myself.
20 Q    I haven't yet on the tape heard anyone say
21 "methamphetamine."
22 A    No, sir.
23 Q    And why is that?
24 A    A number of reasons.  At this point, I don't have any
25 rapport with Mr. Snegirev.  What you'll find over time is that

1  a reluctance amongst people involved in these types of
2  transactions to say the word "methamphetamine," to say the word
3  "Ten ounces of a controlled substance." To say those words is
4  not something that people frequently do during these
5  transactions.
6  02:07:57
7      (Recording played)
8  02:08:48
9  Q   Who is that last voice on the tape?
10 A   That was a -- a statement by -- the very end where there
11 was Mr. Lovell made a comment about Mr. Snegirev's knowledge of
12 sanctions for the crime that we're talking about here.
13 Q   And are you familiar with those sanctions?
14 A   Roughly, yes.
15 Q   Was he even right?
16 A   He was not.
17 Q   Up until that point, had Mr. Lovell played any other role
18 in this conversation?
19 A   His job -- his function that day was to make the
20 introduction.
21 Q   And he -- there was a discussion of -- who asked to see
22 the money?
23 A   I asked Mr. Snegirev if he needed to see the money. It
24 sometimes is a trust issue. He was open-ended on what the
25 price was going to be. I wanted to know what the price was

1        (Recording played)
2   02:13:50
3   Q    There's a discussion of -- I heard the word "price."  Who
4   mentioned price?
5   A    I asked Mr. Snegirev, "When can I find out about the
6   price?"  "I don't know.  I don't know."
7   Q    And there's a voice there coughing.  Who's that?
8   A    That's Mr. Lovell, who was getting sicker as we speak.
9   Q    As the tape proceeds, does he become even more ill?
10  A    Eventually I asked him out of the car.
11  Q    Okay.
12  02:14:12
13       (Recording played)
14  02:14:30
15  Q    So is this the point I can surmise --
16  A    Yes, sir.
17  Q    -- where --
18  A    It is.
19  02:14:38
20       (Recording played)
21  02:14:42
22  Q    Does -- do you and Mr. Snegirev continue to discuss the
23  issue at hand?
24  A    Yes, sir.
25  Q    And is that picked up on the tape?

```
 1  A    It's not on this -- it's not on the wire which -- Mr.
 2  Lovell is leaning out of the car, has actually stepped out of
 3  the car.  And so our -- the continued conversation that we have
 4  is not on the -- on the tape.
 5  Q    Do you recall in substance what you discussed while Mr.
 6  Lovell was becoming ill?
 7  A    Yes, sir.
 8  Q    What did you discuss?
 9  A    The same line of questioning:  "What is the price going to
10  be?"  "I can't know right now.  I can make a phone call.  I'll
11  know shortly."
12  02:15:16
13       (Recording played)
14  02:16:26
15  Q    At that point someone is -- seems to be repeating a phone
16  number.
17  A    I gave Mr. Snegirev my phone number.  We exchanged
18  numbers.
19  Q    And what was the purpose of that?
20  A    He was going to get back in contact with me with the
21  purchase price.
22  02:16:42
23       (Recording played)
24  02:17:07
25  Q    Is that the conclusion of your meeting with Mr. Snegirev?
```

1  of the recording of the telephone conversation that you and I
2  were just discussing.
3  Q    And did you have an opportunity to listen to that exact
4  cassette tape?
5  A    I have.
6  Q    And does that cassette tape reflect a true and accurate
7  copy of the conversation you had with Mr. Snegirev over the
8  phone on February 25th, 2005?
9  A    Yes, sir, it does.
10 Q    What you able also to listen to an electronic recording of
11 that same conversation?
12 A    I was.
13 Q    And is the electronic recording a true and accurate
14 reflection of what's on that cassette tape?
15 A    Yes, sir.
16      MR. GOEKE:  The government moves for admission of
17 Government's Exhibit 2.
18      THE COURT:  Mr. McCoy?
19      MR. MCCOY:  Just a brief question.
20                          VOIR DIRE
21 BY MR. MCCOY:
22 Q    You did not have a warrant when you recorded this
23 conversation either, did you?
24 A    No, sir.
25      MR. MCCOY:  Same objection, Judge.

```
 1  on in the car and the agents on the team are part of that
 2  operation.  They have radios that monitor what's going on in
 3  the car, so that they can take action in the event that there
 4  is a problem in the car or I need assistance sometime.
 5  Q   And going back to that telephone conversation, so actually
 6  that telephone conversation had concluded.  Had you been able
 7  to reach essential terms of a transaction?
 8  A   Yes, we had.
 9  Q   And what were those terms?
10  A   Those terms were $6,000 for three ounces of
11  methamphetamine.
12  Q   Approximately how many -- if you know, approximately how
13  many grams are in an ounce?
14  A   An ounce is a -- a little more than 28 grams.  So a little
15  more than 28 grams in an ounce.
16  Q   Per ounce?
17  A   Yes, sir.
18  Q   And did Mr. Shannon Lovell play any role in this telephone
19  conversation where you reached this agreement?
20  A   No, sir.
21  Q   Did -- in fact, later that night, were you able to -- did
22  you in fact deliver $6,000 to the defendant?
23  A   I did.  We made preparations as a team and I called Mr.
24  Snegirev and indicated that in fact I was coming to the house
25  but that I wasn't going to be going into the house.  I drove
```

1  not necessarily holding a stockpile and has to go to another
2  source for those drugs.  He may be able to get them on credit,
3  and if he can't, he may require -- and doesn't have the -- his
4  own capital -- he may require that I pay him up front.  Such is
5  the term "fronting the money."  And in this case we did front
6  them money.
7  Q    And where'd that money come from?
8  A    That money was -- came from the Municipality of Anchorage.
9  It was APD money.  It was recorded.
10 Q    When you say recorded, what does that mean?
11 A    We make copies of the money, burn duplicates of it in a
12 copy machine.
13 Q    Okay.  Did you attempt to make a recording of that meeting
14 with the defendant when you exchanged the money?
15 A    Yes, sir.
16 Q    And did you have an opportunity to listen to that
17 recording?
18 A    I have.
19 Q    Did that recording come out?
20 A    It was very poor.
21 Q    So were you able to pick up any of the conversation or at
22 least any discussion that Mr. Snegirev had?
23 A    Very, very little.  It was not much that was intelligible
24 at all.
25 Q    And is that something that happens from time to time?

1  them the house numbers as I'm passing so they can keep track of
2  where I am. I told them that I was in front of 2105 and that I
3  was turning the vehicle around so they would know which way I
4  was oriented in the event that we had a problem.
5  Q   So at -- you at this point made contact with Mr. Snegirev
6  in person on March 2nd?
7  A   No. No, not yet. I'm by myself in the truck at that
8  point.
9  02:37:29
10     (Recording played)
11 02:37:38
12 Q   And what did you understand the purpose of this meeting to
13 be?
14 A   I was to take delivery of three of -- the three ounces
15 that I'd paid Mr. Snegirev for.
16 02:37:46
17     (Recording played)
18 02:38:04
19 Q   When you say you're going to call him, how are you going
20 to make that call?
21 A   I'm going to make that telephone call to Mr. Snegirev from
22 a cell phone. It makes my teammates aware of the fact that at
23 least from this point forward, Mr. Snegirev is aware of my
24 presence in the driveway.
25 Q   And that voice we hear, is that your voice?

1  Q   It's late. We won't be here long. But I have a few
2  questions for you. When did you meet Shannon Lovell?
3  A   I had some contact with him late in January.
4  Q   Uh-huh (affirmative). And where did you have that contact
5  with him late in January?
6  A   At the DEA Building.
7  Q   Okay. And he was in custody when he came to the DEA
8  Building, did he not? Was he not?
9  A   He was not.
10 Q   He was not in custody?
11 A   No, sir.
12 Q   Okay. But you were sure that it was in late January that
13 you had contact with him?
14 A   The first time that I did, yes, sir.
15 Q   That was late January?
16 A   Yes, sir.
17 Q   And you're sure about that as -- as sure of that answer as
18 you are the rest of your testimony here today?
19 A   What I'm certain of is that in late January, Detective
20 Doll began an investigation and had contact with him. I assume
21 that at points prior to the dates that we've discussed in this
22 case, he came to the DEA Building. And I can -- I can firm
23 that up by looking at this report. And if in error I can -- I
24 can firm that up right now.
25 Q   Why don't you do that right now, yeah.

A & T TRANSCRIPTS
(817) 685-7556

C-16

```
 1  A    Likely, the first time that I had contact with Mr. Lovell
 2  was in actuality somewheres in the area of the 17th of
 3  February.
 4  Q    So not in January?
 5  A    No, sir.
 6  Q    And you met him at the DEA Building?  Correct?
 7  A    That would have been the first time I saw him, yes.
 8  Q    And your testimony now is he was not in custody?
 9  A    He was not in custody when he came to the DEA Building,
10  no, sir.
11  Q    Okay.  That's fine.  You served as the undercover officer
12  in this case, the person that served as the purchaser, correct?
13  A    Yes, sir.
14  Q    And Detective Doll was the case officer?
15  A    Yes, sir.
16  Q    And so Detective Doll was the one that managed Mr. Lovell.
17  Correct?
18  A    Correct.
19  Q    She was the one that administered payments to him?
20  A    Yes, sir.
21  Q    Okay.  And she's the one that investigated Mr. Lovell's
22  background?
23  A    Yes, sir.
24  Q    Okay.  What did you know about Mr. Lovell's background?
25  A    I knew Mr. Lovell to be a criminal.  I knew --
```

```
 1  Q    Uh-huh (affirmative).
 2  A    -- him to have felony convictions.  I knew him to have
 3  been in custody prior to my meeting him.  And I knew him to
 4  have been brought out of custody for the sake of conducting
 5  drug investigations --
 6  Q    Uh-huh (affirmative).
 7  A    -- by Detective Doll.
 8  Q    Did you know that he was a manipulative person?
 9  A    No, sir.
10  Q    Okay.  Did you know that he lied to his probation officer?
11  A    No, sir.
12  Q    Okay.  Did you look at his court files at the Alaska State
13  Court Building at all?
14  A    I did not.
15  Q    Okay.  Do you know that he has promised judges that he
16  would appear and that he's failed to keep those promises?
17  A    I don't doubt that that's the case.
18  Q    Do you know it?
19  A    I don't.
20  Q    Okay.  But you don't doubt it?
21  A    No, sir.
22  Q    Why don't you doubt it?
23  A    I am not a person that trusts most cooperators.
24  Q    Okay.
25  A    Mr. Lovell is a cooperator, he's a criminal.
```

1  Q    Okay.  Do you think Mr. Lovell wanted something out of
2  this arrangement?
3  A    Cooperators are rarely motivated by anything other than
4  some type of self-serving desire.
5  Q    How about Mr. Lovell?
6  A    He would probably fit in that category.
7  Q    Okay.  So your first contact with Mr. Lovell was around
8  mid-February, February 17th or so, just to make sure we're on
9  the same page?
10 A    Yes, sir.  Based on Detective Doll's report, I would -- I
11 would assume that I had contact with him on the 17th or
12 thereabouts.
13 Q    All right.  And where was he living?
14 A    I know that at times he was living at a hotel or a motel
15 here in Anchorage.
16 Q    What kind of supervision did Mr. Lovell have?
17 A    That would more be a question for Detective Doll, to the
18 extent that I know where Mr. Lovell had obligations to check in
19 with Detective Doll --
20 Q    Uh-huh (affirmative).
21 A    -- by telephone.
22 Q    So is fair for me to assume that you were not responsible
23 for supervising him and keeping track of him --
24 A    No, sir, I was not.
25 Q    -- when he was not working --

```
 1  A    No, sir.
 2  Q    All right.  Now, you've served as case officer in cases
 3  before, similar to this.  Correct?
 4  A    I have served as case officer in other drug
 5  investigations, yes, sir.
 6  Q    And you've testified that you've dealt with cooperating
 7  witnesses before.  Correct?
 8  A    Yes, sir.
 9  Q    All right.  And you do do a background check, so you know
10  about them before you enlist their aid.  Isn't that correct?
11  A    Yes, sir.
12  Q    Okay.  Do you know long -- how long Mr. Lovell had been in
13  jail before he contacted Detective Doll?
14  A    I don't.
15  Q    Okay.  Do you know how many times he attempted to get out
16  of jail before he contacted Detective Doll?
17  A    I do not.
18  Q    Do you know how many times he had contact with Mr.
19  Snegirev?
20  A    Personally, no.  From the reports, I --
21  Q    I'm only interested in what you know, sir.  We're not
22  interested in eliciting hearsay.
23  A    The answer then would be no.
24  Q    All right.  Thank you for your patience.
25       MR. MCCOY:  That's all I have, Judge.
```