1  Q    And how was it packaged?

2  A    He handed me a crinkled-up McDonalds bag, a paper bag, and

3  you can hear it rattle.  Inside that paper bag were some

4  wrappers and then inside, at the very bottom of the bag was a

5  Ziploc clear plastic bag.

6  Q    And what did the material in the plastic bag look like?

7  A    A off-white powder, crystalline.

8  Q    Have you seen that type of a substance before?

9  A    I have.

10 Q    And what did it appear to you to be?

11 A    It was consistent with methamphetamine.

12 02:51:02

13      (Recording played)

14 02:52:08

15 Q    And why is it that you want the other ounce?

16 A    I've already -- I've paid for three ounces.  I've paid

17 $2,000 an ounce.  I've paid in total $6,000, and I've only

18 received two of them.  My role as a drug buyer would be to

19 demand that other ounce.  It's been paid for and I'm entitled

20 to it.

21 Q    Well, and I hear the defendant offering to just take the

22 drugs back and give you your money back, a refund.

23 A    He actually takes several positions in that conversation,

24 but that is one of them, yes.

25 Q    And how come you didn't accept the refund option?

1  Q   Is that -- do you recall, is that the place you left off?
2  A   Yes, sir, approximately.
3  Q   Okay.
4  03:19:29
5      (Recording played)
6  03:20:09
7  Q   Did I hear that correctly?  What did the defendant ask
8  you?
9  A   He asked if I was sure that I was not a cop, and I told
10 him I was sure that I was not a cop.
11 03:20:17
12     (Recording played)
13 03:20:41
14 Q   And are you talking to yourself at this point?
15 A   I'm telling the rest of my teammates that he -- again,
16 some of them can see me, some of them can't, but they can hear
17 me.  So I alert them to the fact that he has gotten out of the
18 vehicle and has gone into the service station.  I also
19 announced to them my intent to pull out of the area.
20 Q   And why did you intend to pull out?
21 A   A number of reasons, but in essence, the -- the
22 transaction has been concluded and that Mr. Snegirev has
23 delivered the two ounces of methamphetamine to me.  Things
24 additionally have become somewhat heated between he and I over
25 the outstanding ounce.  Lastly, there is always in these

1  A    I do.

2  Q    What is that exhibit?

3  A    Exhibit 8 is the -- the methamphetamine in the packaging
4  that was delivered to me by Mr. Snegirev. I would note that
5  the methamphetamine itself is not in the original Ziploc, it is
6  in a -- a Ziploc with someone's handwriting on it and a -- a
7  red stripe or dash across the top of that bag. But the
8  original package that it was in is -- is contained in here.
9  It's the -- the clear Ziploc bag. The yellow paper inside is
10 the -- the loose wrapping that I made reference to and the
11 white -- red, white, and blue paper bag is the McDonalds sack
12 that Mr. Snegirev delivered the methamphetamine to me.

13 Q    Is there any way you can tell if that is in fact the same
14 methamphetamine that you turned over into evidence that day?

15 A    The top of the bag has the initials from the Drug
16 Enforcement Administration on it and there's 3/2 of '05.

17 Q    And --

18 A    And there --

19 Q    -- what did you ultimately do with those drugs? You
20 turned them over to another law enforcement officer?

21 A    Special -- Special Agent Zach Jones and Detective Doll.

22 Q    And do their names appear anywhere on that package?

23 A    They do.

24 Q    And -- what fashion?

25 A    Detective Doll's signature is on the package as a witness,

1  and Special Agent Zach Jones's signature is on the package as
2  the individual who sealed the package.
3  Q    And aside from those markers, did you state that you
4  recognized the wrappings?
5  A    Yes, sir.
6        MR. GOEKE:  Government moves to admit Government's
7  Exhibit 8.
8        MR. MCCOY:  No objection.
9        THE COURT:  Exhibit 8 is admitted, without objection.
10       (Plaintiff's Exhibit 8 admitted)
11       MR. GOEKE:  Thank you.
12 BY MR. GOEKE:
13 Q    So that's -- those would be the drugs that you had in
14 possession -- in your possession after the defendant gave them
15 to you on March 2nd, 2005.
16 A    These are the drugs that Mr. Snegirev delivered to me,
17 yes, sir.
18 Q    So that's the material that he was describing as shard.
19 A    Yes, sir.
20 Q    As shard.  So at this point, going back to the tape -- but
21 at this point on the tape you've decided -- are considering
22 leaving Mr. Snegirev at the liquor store, convenience store.
23 A    Correct.  Obviously, I'm open to input from the case
24 agent, who is Detective Doll.  But in light of the
25 circumstances I've just related to y'all, my sense was to get

1  Q    Okay. What happened later that day? Was a decision made
2  to continue the investigation in any way?
3  A    Yes, sir.
4  Q    And what decision was made?
5  A    The decision was made to go ahead and take Mr. Snegirev
6  into custody.
7  Q    And why was that?
8  A    A -- a number of considerations came in from my
9  perspective. One of them was an issue of officer safety. Mr.
10 Snegirev and I had become fairly heated with each other during
11 the transaction. He did not know that I was a police officer.
12 Had Mr. Snegirev and I had an unintended contact on the street,
13 inadvertent, sitting at an intersection or at a restaurant,
14 there was some potential for violence.
15 Q    So when it came time -- when the decision was made to
16 arrest the defendant, how did -- do you go about planning that
17 arrest?
18 A    I -- yes, a plan was made for the arrest. In essence, Mr.
19 Lovell was instructed to go pick up Mr. Snegirev at the
20 Jefferson address and drive him to a restaurant in town, where
21 we would have an arrest team waiting.
22 Q    And about how long after this transaction we just heard
23 take place -- how long after that was the decision made, or was
24 the meet -- time and place set up for the meet with the
25 (indiscernible) --

1  A   It was that evening. It was a -- a period of several
2  hours. If I can look at this report for a moment.
3  Q   Sure. And will that report reflect your -- refresh your
4  recollection?
5  A   It will, sir.
6  Q   And again, that's the same report you'd had an opportunity
7  to review before?
8  A   Yes, sir. And this actually does not -- I don't see where
9  this contains the precise time, but it was during the evening
10 hours.
11 Q   In any event, did you participate in that arrest?
12 A   I did.
13 Q   And what was your role in the arrest?
14 A   I was part of the arrest team. Several of us were sitting
15 in a vehicle, in a parking lot at -- the parking lot of Pancho
16 Villa's Restaurant off of Spenard Road.
17 Q   And you participated in the decision to make the arrest.
18 Is that right?
19 A   Yes, sir.
20 Q   And why was the decision made to use Mr. Lovell again?
21 A   The same reason that you would initially list a -- a
22 cooperator, is that that person has a relationship with the
23 person that you are investigating.
24 Q   And was Mr. Lovell successful in establishing a time to
25 meet the defendant?

1  A   He was.
2  Q   And what did they decide upon?
3  A   In essence, Mr. Lovell went to the Jefferson address and
4  eventually took Mr. Snegirev on as a passenger.
5  Q   So was this observed by law enforcement?
6  A   It was.
7  Q   Did Mr. -- what was your -- what exactly did you do during
8  this (indiscernible)?
9  A   I was -- we had activities happening at more than one
10 location.  My obligation was to participate in the arrest once
11 Mr. Snegirev and Mr. Lovell arrived in the Pancho Villa parking
12 lot.  There were other agents that were involved in following
13 Mr. Lovell to the address, taking Mr. Snegirev on as a
14 passenger and then driving him to that parking lot, with the
15 understanding that they were going to go to the restaurant.
16 Q   So you were set up on -- at the location where the meet
17 was going to occur, where Mr. Lovell was going to meet the
18 defendant.  Is that right?
19 A   He was going to -- Mr. Lovell was going to bring the
20 defendant to that parking lot together as a couple.  Lovell
21 would drive.  Mr. Snegirev would be the passenger.
22 Q   And so you were stationary at that location --
23 A   Correct.
24 Q   -- (indiscernible) bring him to.  And what did you see?
25 A   Eventually, Mr. Lovell drove into that parking lot, his

1  vehicle, with Mr. Snegirev as a passenger in that car as
2  planned.
3  Q    And before Mr. Lovell picked up Mr. Snegirev, did you just
4  call up Mr. Lovell and he showed up out of the blue, or did you
5  and another -- law enforcement agents take any steps to meet
6  Mr. Lovell before he met Mr. Snegirev?
7  A    There are a number of measures that are taken when dealing
8  with cooperators that are going to have contact with suspects
9  or people that are under -- that are the focus of the
10 investigation.  Those measures were taken.  Mr. Lovell's car
11 was searched, as was Mr. Lovell.  Additionally a transmitter
12 was placed on Mr. Lovell so that -- which would enable the
13 monitoring of conversation between Mr. Lovell and Mr. Snegirev
14 and so that we could hear what was happening in the car.
15 Q    And did you participate in the search of Mr. Lovell's car
16 before he went to meet Mr. Snegirev that evening?
17 A    Yes, sir.
18 Q    And did you find anything in the search?
19 A    No, sir.
20 Q    Did you participate in the search of Mr. Lovell himself?
21 A    I don't know that I did.
22 Q    Were you present when it occurred?
23 A    Yes, sir.
24 Q    Okay.  Was anything found on either Mr. Lovell himself or
25 his vehicle?

```
 1  traffic indicating that the vehicle initially made a stop at
 2  a -- at a -- a store in the area, but then did eventually come
 3  back to the parking lot as planned.  Again, Mr. Lovell was the
 4  driver, Mr. Snegirev was the passenger.  Vehicle came into the
 5  lot, came to a stop.  The vehicle that I was in as well as an
 6  additional police vehicle moved in on that vehicle.  Commands
 7  were given to the occupants of the vehicle, to Mr. Lovell and
 8  to Mr. Snegirev, as to -- we wanted to control their motions
 9  and their actions while they're taken into custody.
10  Q   So I'm guessing -- it sounds like at this point it's no
11  longer undercover?
12  A   It's no longer undercover.  This is a felony stop on a
13  vehicle that contains two males.
14  Q   So marked cruisers come in?  Is it -- would -- did that
15  occur?
16  A   We did not use marked cruisers, we used our vehicles.  But
17  we have available to us signal lights that can sit under the
18  visor.
19  Q   And what was your -- did you participate in that exact --
20  in that felony stop?
21  A   Yes, I did.  I was in one of the vehicles that came up
22  behind Mr. Lovell's vehicle.
23  Q   And what did you see?
24  A   I saw Mr. Snegirev riding as front passenger in Mr.
25  Lovell's car.  Both of the subjects were given commands.  Over
```

time, you learn that where a subject's hands are is of significance in terms of presenting or producing a threat to you. The occupants of the car were ordered to raise their hands up towards the roof where we could see them. I am in a position with several other officers to the rear of Mr. Lovell's car. During those -- during the taking of Mr. Snegirev into custody, both his hands went up. While we were giving instructions, his left hand briefly dropped down out of sight and then back up into sight.

Q  And this is something you observed yourself?
A  Yes, sir, it is.
Q  And did you take any precautions at this point to protect your identity, since you had been dealing with Mr. Snegirev?
A  I was wearing a -- a mask, a balaclava mask.
Q  And what was the purpose of that?
A  It -- recognition by a suspect of an undercover can generate anger, a sense of betrayal, outburst. It's -- it's generally not something that you want to do. So I did not give any verbal commands, I didn't interact. During that initial apprehension, I gave no commands to Mr. Snegirev nor did I communicate with him directly, and my face was hidden other than my eyes.
Q  So essentially, would it be fair to say you played a supporting role?
A  Yes, sir.

```
 1   A    Yes, sir.
 2   Q    -- or four occasions?
 3   A    Yes, sir.
 4   Q    And did you -- were you the one who specifically took Mr.
 5   Snegirev into custody at that point?
 6   A    I was present.  I was not the one who placed handcuffs on
 7   him.
 8   Q    Okay.  And what did you observe?
 9   A    I observed Mr. Snegirev in the front passenger seat.  He
10   was removed, placed in one of the vehicles that was there, and
11   transported.
12   Q    And at this point, was the same done to Mr. Lovell?
13   A    Yes.
14   Q    And at this point did you search Mr. Lovell's car again?
15   A    Yes.
16   Q    What did you find?
17   A    In the front of the car, to the left of the passenger
18   seat, was a plastic bag containing what appeared to be
19   methamphetamine.
20   Q    Okay.
21   A    Additionally, in the back of the car was a package of the
22   small Ziploc -- 100 Ziploc bags.
23   Q    And was this the same car that Mr. Lovell was driving when
24   you were introduced to the defendant?
25   A    Yes, sir.
```

```
 1  Jones's name as the subject that sealed it.
 2  Q    Okay.
 3          MR. GOEKE:  The government moves to admit Government's
 4  Exhibit 9.
 5          THE COURT:  Any --
 6          MR. MCCOY:  No objection, Judge.  No objection.
 7          THE COURT:  Exhibit 9 is --
 8          MR. GOEKE:  And with regard --
 9          THE COURT:  -- admitted in evidence.
10       (Plaintiff's Exhibit 9 admitted)
11  BY MR. GOEKE:
12  Q    And with regard to both Government's Exhibit 8 and 9, were
13  those submitted, to your knowledge, for further analysis?
14  A    They were.
15  Q    Okay.  Did anything else happen during that arrest aside
16  from Mr. Snegirev being taken into custody -- and finding those
17  drugs?
18  A    No, sir.
19  Q    Okay.  Do you know if any other items of interest were
20  taken from Mr. Snegirev's person --
21  A    There were.
22  Q    -- when he was arrested?
23  A    Yes, sir.
24  Q    What was taken from him?
25  A    There were two additional Ziploc bags that were taken from
```

```
 1  Q    It's late.  We won't be here long.  But I have a few
 2  questions for you.  When did you meet Shannon Lovell?
 3  A    I had some contact with him late in January.
 4  Q    Uh-huh (affirmative).  And where did you have that contact
 5  with him late in January?
 6  A    At the DEA Building.
 7  Q    Okay.  And he was in custody when he came to the DEA
 8  Building, did he not?  Was he not?
 9  A    He was not.
10  Q    He was not in custody?
11  A    No, sir.
12  Q    Okay.  But you were sure that it was in late January that
13  you had contact with him?
14  A    The first time that I did, yes, sir.
15  Q    That was late January?
16  A    Yes, sir.
17  Q    And you're sure about that as -- as sure of that answer as
18  you are the rest of your testimony here today?
19  A    What I'm certain of is that in late January, Detective
20  Doll began an investigation and had contact with him.  I assume
21  that at points prior to the dates that we've discussed in this
22  case, he came to the DEA Building.  And I can -- I can firm
23  that up by looking at this report.  And if in error I can -- I
24  can firm that up right now.
25  Q    Why don't you do that right now, yeah.
```

1  A    Likely, the first time that I had contact with Mr. Lovell
2  was in actuality somewheres in the area of the 17th of
3  February.
4  Q    So not in January?
5  A    No, sir.
6  Q    And you met him at the DEA Building?  Correct?
7  A    That would have been the first time I saw him, yes.
8  Q    And your testimony now is he was not in custody?
9  A    He was not in custody when he came to the DEA Building,
10 no, sir.
11 Q    Okay.  That's fine.  You served as the undercover officer
12 in this case, the person that served as the purchaser, correct?
13 A    Yes, sir.
14 Q    And Detective Doll was the case officer?
15 A    Yes, sir.
16 Q    And so Detective Doll was the one that managed Mr. Lovell.
17 Correct?
18 A    Correct.
19 Q    She was the one that administered payments to him?
20 A    Yes, sir.
21 Q    Okay.  And she's the one that investigated Mr. Lovell's
22 background?
23 A    Yes, sir.
24 Q    Okay.  What did you know about Mr. Lovell's background?
25 A    I knew Mr. Lovell to be a criminal.  I knew --

C-34

```
 1  Q    Uh-huh (affirmative).
 2  A    -- him to have felony convictions.  I knew him to have
 3  been in custody prior to my meeting him.  And I knew him to
 4  have been brought out of custody for the sake of conducting
 5  drug investigations --
 6  Q    Uh-huh (affirmative).
 7  A    -- by Detective Doll.
 8  Q    Did you know that he was a manipulative person?
 9  A    No, sir.
10  Q    Okay.  Did you know that he lied to his probation officer?
11  A    No, sir.
12  Q    Okay.  Did you look at his court files at the Alaska State
13  Court Building at all?
14  A    I did not.
15  Q    Okay.  Do you know that he has promised judges that he
16  would appear and that he's failed to keep those promises?
17  A    I don't doubt that that's the case.
18  Q    Do you know it?
19  A    I don't.
20  Q    Okay.  But you don't doubt it?
21  A    No, sir.
22  Q    Why don't you doubt it?
23  A    I am not a person that trusts most cooperators.
24  Q    Okay.
25  A    Mr. Lovell is a cooperator, he's a criminal.
```

1  Q    Okay.  Do you think Mr. Lovell wanted something out of
2  this arrangement?
3  A    Cooperators are rarely motivated by anything other than
4  some type of self-serving desire.
5  Q    How about Mr. Lovell?
6  A    He would probably fit in that category.
7  Q    Okay.  So your first contact with Mr. Lovell was around
8  mid-February, February 17th or so, just to make sure we're on
9  the same page?
10 A    Yes, sir.  Based on Detective Doll's report, I would -- I
11 would assume that I had contact with him on the 17th or
12 thereabouts.
13 Q    All right.  And where was he living?
14 A    I know that at times he was living at a hotel or a motel
15 here in Anchorage.
16 Q    What kind of supervision did Mr. Lovell have?
17 A    That would more be a question for Detective Doll, to the
18 extent that I know where Mr. Lovell had obligations to check in
19 with Detective Doll --
20 Q    Uh-huh (affirmative).
21 A    -- by telephone.
22 Q    So is fair for me to assume that you were not responsible
23 for supervising him and keeping track of him --
24 A    No, sir, I was not.
25 Q    -- when he was not working --

1   A   No, sir.
2   Q   All right. Now, you've served as case officer in cases
3   before, similar to this. Correct?
4   A   I have served as case officer in other drug
5   investigations, yes, sir.
6   Q   And you've testified that you've dealt with cooperating
7   witnesses before. Correct?
8   A   Yes, sir.
9   Q   All right. And you do do a background check, so you know
10  about them before you enlist their aid. Isn't that correct?
11  A   Yes, sir.
12  Q   Okay. Do you know long -- how long Mr. Lovell had been in
13  jail before he contacted Detective Doll?
14  A   I don't.
15  Q   Okay. Do you know how many times he attempted to get out
16  of jail before he contacted Detective Doll?
17  A   I do not.
18  Q   Do you know how many times he had contact with Mr.
19  Snegirev?
20  A   Personally, no. From the reports, I --
21  Q   I'm only interested in what you know, sir. We're not
22  interested in eliciting hearsay.
23  A   The answer then would be no.
24  Q   All right. Thank you for your patience.
25          MR. MCCOY: That's all I have, Judge.

1  told me they're staying.  There are a number of precautions,
2  and they vary depending on a number of factors.
3  Q    And in this case was the cooperator, Mr. Lovell -- was he
4  present at any point when the defendant provided you drugs on
5  March 2nd, 2005?
6  A    No, sir.
7  Q    Did he have any part in setting up that specific meeting?
8  A    No, sir.  If you will remember, my words to Mr. Snegirev
9  in the Sports Authority parking lot were, "Me to you, you to
10 me."
11 Q    And what did that mean?
12 A    That meant Mr. Snegirev to me, me to Mr. Snegirev.
13 Shannon was not to be a party to this transaction other than
14 the initial introduction.
15 Q    You mentioned earlier that because Anchorage is a
16 relatively small community, you -- one of the reasons you
17 arrested the defendant on March 20 -- March 2nd, 2005, was
18 because people might recognize you, you might run into them on
19 the street.  Is that right?
20 A    Absolutely.  He didn't know that I was the police.  And he
21 and I were angry enough at each other in terms of our roles
22 that there -- violence may have been an issue, and --
23 Q    So does that --
24 A    -- among --
25 Q    -- then size of this community, does that play any role in

```
 1  terms of a cooperating source being in jail or out of jail?
 2  A    As a small town, that type of word travels fairly quickly.
 3  Q    And is that something that's discussed in the jail, to
 4  your knowledge?
 5  A    Absolutely.
 6  Q    Thank you.  No further questions.
 7          THE COURT:  Anything further, Mr. McCoy?
 8          MR. MCCOY:  Very briefly.
 9                    RECROSS EXAMINATION
10  BY MR. MCCOY:
11  Q    Mr. Lovell's still free, isn't he?
12  A    As far as I know, he is, sir.
13  Q    All right.  And if he's violated any of the conditions
14  that have been set on him, you don't know that, do you?
15  A    Sitting here right now, I do not --
16  Q    All right.
17  A    -- know his circumstances.
18  Q    And so the only way he goes back to jail for violating
19  those conviction -- conditions is if you know about them.
20  Right?
21  A    Certainly, or his conduct is detected by other law
22  enforcement agents.
23  Q    Thank you.  That's all I have.
24  A    Yes, sir.
25          THE COURT:  Detective Dorr, thank you very much, sir.
```

1  A    Eventually, they will go back to jail, or they'll be
2  marked -- eventually, they'll go back to jail or they won't get
3  the benefit of the bargain, or the benefit will be limited to
4  whatever it is they did before you decided they were no longer
5  somebody that you were willing to work with.
6  Q    And if your -- if -- in your experience, is it --
7  operating or working with a CI, when you're working with a CI,
8  what types of restrictions do you place on them?  Do you allow
9  them to, for instance, commit other criminal activity?
10           MR. MCCOY:  Objection.  Leading.
11           THE COURT:  Sustained as to the last part of that two-
12 part question.
13 BY MR. GOEKE:
14 Q    What types of restrictions do you place on the CIs?
15 A    There are a number.  And it -- again, it varies with
16 cooperator to cooperator.  I need to know where the person is
17 staying.  I need to know how the person is meeting their
18 obligations.  I need to know who he is in contact with.  I need
19 to know directly after contacts with somebody that is involved
20 in criminal activity.  I set up a frequency with which I have
21 contact that is initiated by the cooperator.  That person is to
22 call me at a given time.  I may reach out to that person at a
23 given time.  I may tell them they have to be at a land line at
24 a given time.  I may drive by their address.  My crew, my
25 entire ship, may go take a look at where it is this person has