1  A    My full name is Monique Doll.  The last name is spelled D-

2  o-l-l.  And I can be reached or contacted at the Anchorage

3  Police Department, 4501 South Bragaw, Anchorage, Alaska, 99507.

4         THE CLERK:  Thank you.

5         THE COURT:  Mr. Goeke.

6         MR. GOEKE:  May I inquire, Your Honor?

7         THE COURT:  Yes.

8                    **DIRECT EXAMINATION**

9  BY MR. GOEKE:

10  Q    Detective Doll, how long have you been employed by APD?

11  A    A little over seven years now.

12  Q    And what's your current assignment with Anchorage Police

13  Department?

14  A    Currently I'm a detective with the Metro Drug Enforcement

15  Unit.

16  Q    And how long have you been a detective with Metro?

17  A    A little over three years.

18  Q    And prior to joining Metro, what was your role at APD?

19  A    Prior to joining Metro, I was a burglary detective for

20  approximately six weeks.  Before becoming a burglary detective,

21  I spent a year in the department's special assignment unit,

22  which dealt with street-level drugs, prostitution, and

23  gambling.  And prior to the special assignment unit, I spent

24  four years on patrol, swing shift, 3 p.m. to 1 a.m.

25  Q    Do you have any other law enforcement experience besides

1  that which you just related to the Court?

2  A    No, sir, I don't.

3  Q    What was your assignment in February and March of 2005?

4  A    In February and March of 2005, I was in the same position

5  as I am now, as a detective with the drug enforcement unit.

6  Q    Did you conduct an investigation concerning the defendant?

7  A    I did.

8  Q    In -- during -- as part of that investigation, did you

9  utilize a CI?

10  A    I did.

11  Q    And who was the CI?

12  A    His name was Shannon Lovell.

13  Q    Did you also use an undercover officer in that

14  investigation?

15  A    I did.  I asked Detective Dorr to operate in an undercover

16  status.

17  Q    How many investigations have you conducted using a CI?

18  A    Separate cases, I would say anywhere from 10 to 20.

19  Q    How many investigations have you participated in or

20  conducted using an undercover officer?

21  A    Including myself?

22  Q    Yes.

23  A    Hundreds.  When we were in the special assignment unit, we

24  did reversal stings, prostitution stings, street-level drug

25  stings, and I participated as an undercover officer almost

1  every day for the entire year.

2  Q    So are you familiar -- were you essentially in charge of

3  running the CI named Mr. Lovell?

4  A    Correct.  I was the case officer for this case, so I was

5  in charge of making the decisions for the case, running the CI,

6  controlling the CI, deciding when the buys were going to take

7  place, how much we were going to buy, when the takedown was

8  going to take place.

9  Q    With respect to the charges that the defendant faces here

10 in this trial, what was the CI's role with regard to the

11 defendant?

12 A    The CI's role was strictly to perform an introduction of

13 the undercover officer to Mr. Snegirev.

14 Q    Now, we've heard some testimony about the CI and his

15 criminal background.  Are you familiar with his criminal

16 background?

17 A    I am.

18 Q    And what is his criminal background?

19 A    I believe he has two convictions, felony convictions for a

20 failure to appear in front of a judge, and a conviction from

21 his conduct involving a controlled substance, and then a

22 misdemeanor driving conviction.  The controlled substance

23 conviction was also a felony.

24 Q    At the time you started using him, was he in jail?

25 A    Yes, he was.

1  Q    What was he in jail for?

2  A    He was in jail for a petition to revoke probation on his

3  misconduct involving a controlled substance charge.

4  Q    Why did you decide to start using him on the street?

5  A    I contacted him while he was in jail, and basically, we

6  perform a debrief:  You tell me who you can buy drugs from,

7  what kind of drugs you can buy, what level of drugs you can

8  buy.  Based on what Mr. Lovell told me, I approached my

9  supervisor, who gave me the authorization to contact the

10  district attorney and ask the district attorney to allow Mr.

11  Lovell out -- out of jail presentencing.

12  Q    And when you say the district attorney, is that the state

13  district attorney?

14  A    Yes, sir.

15  Q    Okay.  And did they authorize that, in fact?

16  A    Yes, they did.

17  Q    And why did you decide to put Mr. Lovell back on the

18  street?  Did he identify people you were interested in?

19  A    He did.  He identified people that could do significant

20  quantities of drugs, people that, to my mind, posed a

21  significant threat to the community, not only drugs, but

22  possibly guns, stolen cars, things of that sort.

23  Q    When you decide to use a CI in that manner and release him

24  back into the community, do you take any precautions to control

25  their behavior?

C -44

1  A    Absolutely.  And with Mr. Lovell being a convicted felon,

2  especially on a failure to appear from bail, I had special

3  attention towards controlling him.  I contact -- contacted him

4  on a land line multiple times a day.  I dropped by and visited

5  him to make sure he was behaving himself multiple times a day.

6  He was told to contact me twice a day at specific times.  He

7  was told to get a job, you know, a paying job, and basically we

8  do what we can to make them a productive member of society.

9  Q    Did you give him any instructions about criminal activity?

10  A    Yes.  He's not instructed or given leniency in any sort of

11  way to conduct any sort of criminal activity.  His assignments

12  with us are directed assignments.  We will bring him in to DEA

13  Main.  We will tell him exactly what he is going to do, when

14  the mission is going to begin, when the mission is going to

15  end.  And he was told that he shall not have any contact with

16  these people in between the directed assignments.

17  Q    So when did you first start working with that CI, Mr.

18  Lovell?

19  A    I believe it was the beginning of February of this year.

20  Q    And did you provide him any other benefits in terms of

21  money or other support?

22  A    I did.  We gave him money for a hotel room when he

23  initially got out of jail.  He didn't have anyplace to stay.

24  He was originally from the Wasilla area, and it's difficult to

25  control somebody like that at a distance.  So because I didn't

1  want him to return to the Wasilla area, I -- we put him up in a

2  hotel.  We also paid for his cell phone, food -- money for food

3  and -- and the like.

4  Q    About how much money do you think you spent on Mr. Lovell?

5  A    I would estimate a little over $5,000.

6  Q    And over what time frame did this occur?

7  A    From February of this year to May of this year.

8  Q    And is that a common thing for you to do in your

9  experience and training when you work with a CI?

10  A    Absolutely.  CIs know how to do one thing best.  The

11  easiest thing that they know how to do to make money at is deal

12  drugs.  Well, if we get them out of jail, we don't want them to

13  deal drugs.  So if we provide for their needs, basic needs, a

14  place to stay, something to eat, a cell phone to contact

15  people, it reduces the likelihood that they're going to turn to

16  a life of crime to make themselves comfortable.

17  Q    And if -- you mentioned you had experience conducting

18  undercover operations.

19  A    I have.

20  Q    Why do you even need to use a CI if you can just conduct

21  an undercover operation with an officer?

22  A    Well, this isn't street-level drugs, and mid- to high-

23  level drugs.  The old adage, "It takes one to know one," really

24  applies.  Some ordinary law-abiding citizen just can't go into

25  a bar off of the street and say, "Hey, can I buy an ounce of

1  A    Right.  It's a petition to revoke his probation.  He was
2  on probation for the misconduct of a controlled substance and
3  he had violated the terms of his probation.  And so the
4  probation officer had remanded him.
5  Q    So had he been in fact yet revoked or was just awaiting a
6  hearing on the revocation petition?
7  A    I -- I -- I'm not really sure.  I believe he was just
8  awaiting the revocation hearing.
9  Q    And during the time that you were using -- or used Mr.
10 Lovell to introduce Detective Dorr to the defendant, did Mr.
11 Lovell violate any of the terms of -- terms and rules you'd set
12 up for him?
13 A    No, not to my knowledge.
14 Q    And has he afterward?
15 A    I -- not to my knowledge.  I -- he has greatly declined
16 his contact with me, to the point where I can contact him on
17 his cell phone but he will not meet with me in any standard
18 location.  I have advised the district attorney's office that,
19 hey, you know, the guy that we let out of jail isn't behaving
20 any longer, and the district attorney is taking steps to
21 rectify that, both by contacting his attorney, contacting his
22 probation officer.  I don't believe he set him on for a bail
23 hearing to return back to jail yet.
24 Q    And did -- when he started to not have the contact you'd
25 like him to have with you, did that occur after the events

C-47

1  A    No --

2  Q    -- any in his car?

3  A    Well, to -- I was not one of the people that searched the

4  CS's vehicle after the -- after the arrest was made.  I believe

5  it was Detective Dorr and Special Agent Jones.  And other than

6  the ounce of methamphetamine, I don't believe they found any

7  other contraband.

8  Q    And back to the introduction in February 25th, 2005.  Did

9  you have a specific role -- aside from dealing with the CI, did

10 you have a specific role in that operation -- that

11 introduction?

12 A    I did.  I instructed the CI to go -- at first I instructed

13 him to contact Mr. Snegirev to see if Mr. Snegirev was home.

14 We got in contact with Mr. Snegirev.  After he was searched,

15 his vehicle was searched and outfitted with the monitoring

16 device, we followed him -- we followed the CI, always keeping

17 in eye contact with him, to 1200 Surrey Circle, monitoring his

18 conversation with Mr. Snegirev while he was inside 1200 Surrey

19 Circle and out of our direct eyesight, followed him from Surrey

20 Circle to the Sports Authority, where they met with Detective

21 Dorr.  Once Detective Dorr got out of the CS's vehicle after

22 the introduction, we followed him back to Surrey Circle, where

23 Mr. Snegirev got out of the vehicle, and then followed the CS

24 back to DEA Main.

25 Q    So it sounds like --

1  A    Correct.  The buy money was exchanged at about 7 o'clock

2  in the evening and surveillance was maintained throughout the

3  night and to the next morning.  I was part of the surveillance

4  team that came on at about 4 a.m. the next morning, so I

5  believe that's the 26th.  Myself and other members of the

6  surveillance team followed Mr. Snegirev as he got into a

7  maroon -- I believe it was an older-model Camaro, drove -- he

8  was a passenger in a -- in the vehicle that drove to Anchorage

9  International Airport, and got on an Alaska Airlines flight at

10 11 a.m. to Portland, Oregon.

11 Q    And you were part of the team that actually -- you

12 actually saw him go to the airport?

13 A    We actually saw him get on the jetway to get onto the

14 plane and then confirmed via the ticket agent that he was

15 present on the plane.

16 Q    And were you part of the investigation as it continued

17 when the drugs were actually exchanged on March 2nd, 2005?

18 A    Yes, I was.  On March 2nd, I instructed -- Detective Dorr

19 received a call from Mr. Snegirev.  I instructed Detective Dorr

20 to take the call and initiate setting up the meet to obtain the

21 drugs later that afternoon.  I also participated in

22 surveillance of Detective Dorr when he went to 2105 Roosevelt

23 to pick up the drugs, and was instructing Detective Dorr via

24 cell phone on what to do, where to drive, where not to go, when

25 to leave Mr. Snegirev, and so forth.  I basically were -- was

1  involving a controlled substance as well.

2  Q    He had Oxycodone, didn't he?

3  A    I don't know what that conviction was for.

4  Q    Okay.  Well, you knew that he was in jail when he called

5  you up, right?

6  A    He actually didn't call me up.

7  Q    Uh-huh (affirmative).

8  A    He got ahold of me by a -- a state trooper that he had

9  been cooperating with.

10  Q    Okay.  And he had a lawyer at the time, didn't he?

11  A    I believe he did.

12  Q    All right.  And he was in jail at the time, wasn't he?

13  A    He was.

14  Q    All right.  He was in the Anchorage Jail complex, right?

15  A    Correct.

16  Q    All right.  And that's where they take people in Anchorage

17  who are arrested, right?

18  A    Correct.

19  Q    It's a maximum-security facility?

20  A    I believe it has two -- two parts to it, the Anchorage

21  Jail and Cook Inlet Pretrial.  And I'm not sure what the level

22  of security is in --

23  Q    You have --

24  A    -- either one.

25  Q    You have to go through multiple locked doors to get in,

1  Q    All right.  And you know that he wasn't complying with
2  probation because he wasn't meeting with his probation officer,
3  was he?
4  A    I'm not sure if that was one of the reasons why he was
5  PTRP'd or not.
6  Q    Okay.  You didn't bother to talk to his probation officer
7  to find out?
8  A    I actually tried to contact his probation officer and I
9  had a brief discussion with her before I contacted Mr. Lovell.
10  I did not -- I asked her basically why he had been revoked.
11  She --
12  Q    Did you ask her for a copy of the petition so you could
13  know for yourself?
14  A    No, sir, I didn't.
15  Q    Okay.  Did you know that he was associating with felons
16  when he wasn't supposed to do that?
17  A    No.
18  Q    All right.  Did you know that he hadn't reported to his
19  probation officer for many, many months?
20  A    No.
21  Q    Okay.  You didn't ask the P.O. about that?
22  A    I -- what I asked the probation officer was, and what I'm
23  concerned with, is his violent history.
24  Q    Uh-huh (affirmative).
25  A    Like I said, it takes one to know one.  Most of our CI's

C-51

1   are involved in drugs at one -- in one way, shape, or form.

2   When they're out and they are under our control, we want to

3   keep them as clean as possible.  And --

4   Q   Uh-huh (affirmative).

5   A   -- we want to control their movements so they don't go

6   back to distributing drugs.

7   Q   Okay.  So you are concerned about their potential for

8   violence.  Is that correct?

9   A   Yes.

10  Q   All right.  Did you know that he was charged with

11  possessing a weapon when he wasn't supposed to have one?

12  A   No.

13  Q   You didn't?

14  A   No.

15  Q   Okay.

16          MR. MCCOY:  Judge, can I approach the witness, please?

17          THE COURT:  You may.

18          MR. MCCOY:  I'm -- again, request permission to

19  approach the witness, Judge.

20          THE COURT:  You have it.

21  BY MR. MCCOY:

22  Q   I've handed you the petition to revoke probation that was

23  filed in Mr. Lovell's case.  Would you look at allegation

24  number I?

25  A   Yes, sir.

1  Q   Isn't it true that when he was stopped by a police

2  officer, he had a firearm in his car?

3  A   That's correct, according to this petition to revoke

4  probation.  Inside the locked rifle case was a firearm.

5  Q   Uh-huh (affirmative).  And you didn't know that, did you?

6  A   No, I did not.

7  Q   Until today?

8  A   Correct.

9  Q   Have you seen arrest warrants before?

10  A   Yes, sir.

11          MR. MCCOY:  Approach the witness?

12  BY MR. MCCOY:

13  Q   Would you tell me what this is?

14  A   This is an arrest warrant for Shannon Lovell, date of

15  birth 5/30/82.  It says he's commanded to appear for -- and I

16  can't read the -- it's handwritten and I can't read it.  But

17  bail for his offense is set at $2,000 cash or corporate plus

18  third-party custodian.  It's signed by Judge Larry Card.

19  Q   Is that a bench warrant?

20  A   Yes, it is.

21  Q   Is that what a judge issues when he wants someone arrested

22  because the person hasn't complied with the conditions of

23  probation?

24  A   Or other reasons, correct.

25  Q   Okay.  And when a bench warrant is issued, is it given to

1  police officers?

2  A    I'm not -- I'm not sure.

3  Q    Is it given to Alaska State Troopers?

4  A    It -- it -- I -- I don't know.

5  Q    Uh-huh (affirmative).

6  A    I -- I've never been on the paperwork end of that cycle.

7  I mean, I've received bench warrants before and when I get a

8  bench warrant, I get it entered and go out and look for the

9  person that I've just obtained a bench warrant for or an arrest

10  warrant for, rather.   I'm not sure how the paperwork cycles

11  through from the probation office --

12  Q    Okay.

13  A    -- after they get a bench warrant.

14  Q    Okay.   And when you arrest someone on a bench warrant,

15  what do you do?

16  A    Take them to jail.

17  Q    And what do you do with the paperwork?   You fill out a

18  return that tells the judge you've --

19  A    Correct.

20  Q    -- arrested the person, correct?

21  A    Correct.   Yep.

22  Q    When does that tell you that Mr. Lovell was arrested?

23  A    It says that the bench warrant was served on 12/29 of

24  2004.

25  Q    Okay.   Does that say when the officer received the warrant

C-54

1   was 12/29/2004 and that he served it or executed or arrested

2   the person on 12/30/2004?  Isn't that what it says?

3   A    Actually it says that the judge signed it on 12/28 of 2004

4   and that the original warrant was received on 12/29 of 2004 and

5   that the return date was 12/30 of 2004.

6   Q    Which means he was arrested on somewhere between the 29th

7   and the 30th of 2004.  Correct?

8   A    Correct.

9   Q    Okay.  Thank you.  Do you know who Judge Dan Hensley is?

10  A    No, I do not.

11  Q    Do you know -- have you heard of a Judge Hensley who's a

12  superior court judge?

13  A    I have.

14  Q    Okay.  You know that he -- Judge Hensley's the presiding

15  judge for the Alaska State Court System here in Anchorage,

16  don't you?

17  A    I don't know --

18  Q    Uh-huh (affirmative).

19  A    -- if that is the case.

20  Q    Okay.  But you've heard the name and you know he's a

21  judge?

22  A    Correct.

23  Q    Okay.  All right.  And you know that Mr. Lovell wanted to

24  get out of jail, didn't you?

25  A    Yes, I did.

C-55

1  Q    Okay.  And one of the things that when you're in jail and

2  you want to get out of jail is you get a lawyer and you ask the

3  lawyer to let you out of jail.  Isn't that what happens?

4  A    Correct, or --

5  Q    And you ask the judge --

6  A    -- review bail or --

7  Q    Uh-huh (affirmative).  Okay.  All right.  And you checked

8  on Mr. Lovell's background and you knew that he wanted out of

9  jail, didn't you?

10  A    I knew that he wanted out of jail, not from his background

11  but from the state trooper that had gotten in touch with me.

12  Q    All right.

13        MR. MCCOY:  Can I approach the witness again, Judge?

14  BY MR. MCCOY:

15  Q    Does that piece of paper have Mr. Lovell's name on it?

16  A    It does, as the defendant.

17  Q    And does it reflect that a court said he couldn't get out

18  of jail because "I don't think he'll comply"?

19  A    It said that the court said, "The defendant's record,

20  don't think he'll comply.  Can set bail hearing on in a month."

21  Q    Okay.  And it says that Mr. Lovell was present?

22  A    Yes, sir.

23  Q    And that he had a lawyer?

24  A    Correct.

25  Q    And that he was in custody?

1  A    Correct, $2,000 cash corporate, plus third party.

2  Q    And that was January 11th, 2005?

3  A    Correct.

4  Q    And he didn't get out of jail, did he?

5  A    This -- I would assume not, but it doesn't say here, you

6  know, whether or not it was denied, I don't think.

7  Q    Uh-huh (affirmative).

8  A    I've never seen a paper like this before, so --

9  Q    Okay.  You knew that the prosecutor -- state prosecutor

10  opposed his release, didn't you?

11  A    Not -- I've never spoke with the state prosecutor.  I

12  don't know if he opposed his release or not.  The only

13  prosecutor that I spoke with was defense attorney -- I'm sorry,

14  District Attorney John Bandle.

15  Q    Okay.  Well, regardless, all the things that we've been

16  talking about, the arrest and the bail review hearing, that

17  happened before you met Mr. Lovell, didn't it?

18  A    It did.

19  Q    Okay.  And after you met Mr. Lovell, you made some calls

20  to a prosecutor?

21  A    Correct.

22  Q    And who was that prosecutor again?

23  A    John Bandle.

24  Q    And you asked Mr. Bandle not to oppose his release?

25  A    Actually, no.  I asked Mr. Bandle if he could put Mr.

C-52

1  A    Uh-huh (affirmative).

2  Q    Says:  "Defendant released OR on bail conditions."

3  A    Correct.

4  Q    Okay.  And "vacated contested adjudication hearing."

5  Right?  Is that what it says?

6  A    Correct.

7  Q    All right.  And --

8  A    It actually says "vacated contested ADJ."  But if that's

9  adjudication hearing, I'll --

10  Q    Okay.  So that means he got out of jail.  Right?

11  A    Correct.

12  Q    He was released OR.  What does OR mean?

13  A    On his own recognizance.  And actually I believe that said

14  "with conditions" as well.

15  Q    It means that he didn't have to post the $2,000.  Right?

16  A    Correct.

17  Q    And it means that he didn't need a third-party custodian.

18  Right?

19  A    Correct.

20  Q    Okay.  All right.  And that was on February 4th, wasn't

21  it?

22  A    It was.

23  Q    If you'd look to the screen, you'll see something that's

24  been identified as Defendant's Exhibit B.  Do you recognize

25  that?

1  Q    And then a few days later you gave him -- did he have a
2  car?

3  A    I do not think at that time he had a car.  He didn't have
4  a car for the first several days after he got out of jail, and
5  he was able to muster one up and drive around in -- in it.

6  Q    And he must have told you he needed money for fuel,
7  because you gave him some, didn't you?

8  A    Correct.

9  Q    All right.  And then you gave him $1,000 on the 10th of
10 February?

11 A    Correct, for a hotel.

12 Q    All right.  But you didn't get a receipt, did you?

13 A    No.

14 Q    Okay.  So that's $2,000 that you don't have receipts for
15 that he gave you -- that --

16 A    Correct.

17 Q    -- you gave him, I'm sorry.

18 A    Yes, sir.

19 Q    All right.  And then -- so this -- there's money on the
20 11th, the 15th, the 22nd, and the 24th.  Sometimes you have
21 receipts, sometimes you don't.  Right?

22 A    Correct.

23 Q    All right.  And then on some date in March -- we don't
24 know what date it is -- you gave him $1,100.  Right?

25 A    Actually, DEA gave him $1,100 for rent.

1  A    He is.

2  Q    You don't know where he is, do you?

3  A    I don't know where he is.  I --

4  Q    He --

5  A    -- I can contact him on his cell phone, but he won't tell

6  me what his physical location is.  I haven't seen him in about

7  six weeks.

8  Q    So he's got his freedom from you.  Right?

9  A    Well, he's -- he is still bound to call me and --

10  Q    Uh-huh (affirmative).

11  A    -- instructed to call me.

12  Q    Uh-huh (affirmative).  Uh-huh (affirmative).

13  A    He certainly isn't on as tight of a tether as he was when

14  he first got out.

15  Q    Well, Judge Hensley didn't trust him, right?

16  A    Correct.

17  Q    And you didn't trust him?

18  A    Absolutely not.  That's why --

19  Q    Right.

20  A    -- we inserted an undercover officer into this --

21  Q    Uh-huh (affirmative).  Uh-huh (affirmative).

22  A    -- investigation because we didn't trust the confidential

23  informant.  He had no reliability.  And so we used him to open

24  the door for an introduction.

25  Q    All right.  But he didn't have a -- do you know what a 24-

1    States District Court is again in session.  Please be seated.

2            THE COURT:  Good afternoon.  We have received a note

3    from the jury.  For the record -- I know you each have copies,

4    but for the record, it reads:  "As to Count 2, can we consider

5    possession separate from intent to distribute, or must it be

6    dealt with as a whole count?"  Would the lawyers like to speak

7    to that?

8            MR. GOEKE:  Your Honor, from the government's

9    perspective, one possible solution might be to merely instruct

10   the jury about the defense of possession, and use the pattern

11   instruction 3.18.

12           THE COURT:  All right.  Well --

13           MR. GOEKE:  Merely reads --

14           THE COURT:  -- does it not occur to you that they may

15   be asking if they can include a conviction on the lesser

16   included offense?

17           MR. GOEKE:  It does.  And counsel and I have discussed

18   that, and I don't believe that the defendant is going to ask

19   for that instruction.  The government's not asking for that

20   instruction.

21           MR. MCCOY:  If --

22           THE COURT:  The government doesn't want it.  Okay, Mr.

23   McCoy?

24           MR. MCCOY:  Yeah, I don't want it either.  It's -- I

25   think that's what they're asking about.  And --

1  binding precedent.  Nevertheless, the Court takes some comfort

2  in the view that there are at least three members of the Court

3  of Appeals who presumably would rule that way in a published

4  decision where they're required to do that.

5      All right.  I think then we're ready for the jury to

6  come in and hear closing arguments.

7      MR. MCCOY:  Well, I guess the -- just the order, just

8  so I have it in my head what we're going to do -- the jury will

9  come in, you'll ask me what our -- whether we intend to put any

10  evidence on, I will rest, and then you'll invite to do closing

11  argument.

12      THE COURT:  Correct, and then we'll go straight to

13  closing arguments, my understanding being that both counsel are

14  ready.

15      MR. MCCOY:  Yes.

16      MR. GOEKE:  Yes, Your Honor.

17      THE COURT:  All right.

18  (Jury present at 10:42 a.m.)

19      THE COURT:  Welcome back, ladies and gentlemen.  Mr. --

20  as you know, the government has rested its case.  Mr. McCoy,

21  will the defense be presenting any evidence at this time?

22      MR. MCCOY:  No, Your Honor, thank you.  We will rest at

23  this time.

24      THE COURT:  Thank you, sir.  All right, ladies and

25  gentlemen, we've reached the point in the trial where counsel